UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                      Plaintiff,                        CRIMINAL NO. 16-cr-20003

v.

                                                    Hon. Judith E. Levy

AHMAD RASHID LEWIS,

                      Defendant.

_____/

### United States' Response Opposing Defendant's Motion for Compassionate Release and Request for Home Confinement Based upon COVID-19 Pandemic

On October 31, 2017, Defendant Ahmad Rashid Lewis was sentenced by this court to a term of 60 months' imprisonment, 3 years supervised release for Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §924(c)(R. 45: Judgment) (R. 38: Plea Agreement). The term of imprisonment was to run consecutive to the 60 month sentence imposed in *United States v. Ahmad Rashid Lewis*, Case No. 14CR20420 (R. 45 : Judgment). His crime involved the possession of multiple firearms, ammunition, narcotics packaging materials and heroin. Lewis committed the drug trafficking while on pre-trial release in another federal case in this district, *United States v. Ahmad Rashid Lewis*, Case No. 14CR20420, Honorable Victoria A. Roberts presiding.    In that case Lewis

1

pleaded guilty to Possession with Intent to Distribute a Controlled Substance, a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (R.50: Plea Agreement, Dkt. No. 14CR20420).

Lewis began serving his sentence on January 18, 2018. He is presently incarcerated at FCI Fort Dix, and has served approximately 54 months of a 120 month sentence. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and for the Court to order that his sentence be reduced to home confinement. His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of June 10, 2020, these directives have already resulted in at least 4010 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Lewis does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular

2

prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Lewis' failure to meet the criteria in USSG § 1B1.13 also forecloses relief.

*Third*, even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Lewis does not have a condition that places him at higher risk from Covid-19. Lewis has been diagnosed with hyperthyroidism, Graves disease, schizophrenia and depression (Exhibit 1, Medical Records). Lewis' medical conditions are being monitored, controlled and managed with medication by the BOP medical staff. Lewis has not been diagnosed with Covid-19, and has not displayed symptoms.

Lewis' current offense, his prior criminal history and his current mental health issues make him a danger to the community, which precludes release under USSG § 1B1.13(2). His designation by the BOP as a medium risk recidivism confirms this (Exhibit 2, Inmate History/Recidivism Score). In this case, Lewis was convicted of possession of a firearm in furtherance of drug trafficking. A felony offense which carries a mandatory minimum sentence of 5 years' imprisonment (consecutive) and a maximum penalty of life imprisonment (R. 45: Judgment). He committed the instant offense of armed drug trafficking while on pre-trial release in another drug

trafficking case, which demonstrates his inability to abide by rules and conditions ordered by a court.

*Further*, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support Lewis' release. Lewis' prior criminal history includes several convictions for drug possession and drug trafficking, as well as traffic violations (PSR, ¶¶ 20-30). During several of those cases he was found guilty of parole/probation violations. He has engaged in a consistent pattern of illegal drug activity since age 19. At the time of his conviction in this case he was 35 years of age. At the time of his arrest, Lewis was exiting his mother's house, which was searched by law enforcement. Recovered from the house was heroin, marijuana, methadone pills, lysergic acid diethylamide (LSD), fentanyl patches, a knife, various rounds of firearm ammunition and a Norinco, 7.62X39 SKS rifle. During a search of Lewis' car officers recovered six handguns. Inside the garage, authorities found two rusted shotguns, a Derringer pistol, a plastic container with an extended magazine and .380-caliber ammunition (PSR, ¶¶ 12-13).

Lewis has been diagnosed with schizophrenia, hyperthyroidism, Graves disease and depression. He currently takes medication to address those medical conditions. Possessing firearms and narcotics puts the entire community at risk. Those risks, combined with his mental health issues, makes his release even more improper under the § 3553(a) factors.

4

## Background

Lewis' criminal history began when he was just 19 years old in 2001 when he began selling drugs to earn money. Between 2001 and 2009, Lewis pleaded guilty to five drug-related offenses and one weapon-related offense (PSR, ¶¶ 20-30). He was on federal supervision in *United States v. Ahmad Rashid Lewis*, Case No. 14-CR-20420 (Hon. Victoria A. Roberts presiding) when he committed the instant crime. Lewis was sentenced to two 60-month terms of imprisonment, to run consecutive to each other, for a total term of imprisonment of 120 months. Lewis began serving his prison sentence on January 18, 2018, and is currently incarcerated at FCI Fort Dix. His projected release date is June 10, 2024.

Lewis is 38 years old. His underlying medical conditions are hyperthyroidism, Graves disease, schizophrenia and depression. He currently takes prescribed medication for each of the conditions. On April 15, 2020, he was approved for surgery (Thyroidectomy), which has been postponed due to Covid-19. Nevertheless, Lewis has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Lewis originally requested relief from the BOP on April 13, 2020 (Exhibit 3). His request was denied on April 17, 2020, on the basis that his concerns about being potentially exposed to, or possibly contracting Covid-19 did not warrant an early release from his sentence. (Exhibit 4). Lewis also requested that

counsel be appointed to represent him in this motion, which was granted by this Court (R. 48: Order Appointing Counsel). Counsel was appointed for Lewis on June 6, 2020.

**Argument**

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

6

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from

Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4088 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney

8

General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, *en masse*. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

10

### C. The Court should decline Lewis' request for a recommendation that he be granted home confinement.

The Court should also deny Lewis' request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Lewis is not a strong candidate for it. Lewis was convicted of a crime involving armed drug trafficking. His prior criminal record convictions for drug- and firearm-related offenses. He was on federal pre-trial release when the instant crime was committed. Those facts suggest that if Lewis were now released to home confinement, he would perform no better. He has only served 4.5 years of his 10-year sentence. The BOP has determined that he poses a medium risk of recidivism (Exhibit 2). He has not yet completed his BOP requirements for release. He has no assets and no means of financial support if he was released to home confinement. Further, the location he suggests as a place of home confinement is his mother's house, the place where he was arrested and in which numerous firearms and drugs were found. Lewis' record suggests that his release into home confinement would quickly spiral into additional criminal conduct.

## II.     The Court should deny Lewis' motion for compassionate release.

Lewis' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's

authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___ F.3d __, 2020 WL 2845694 (6th Cir. June 2, 2020); *United States v Raia*, 954 F. 3d 594, 595-96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Alam*, 2020 WL 2845694, at *4; *see Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United*

12

*States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

Lewis requested relief from his sentence and a transfer to home confinement to the warden on April 13, 2020 (Exhibit 3). He based his request on a heightened health risk to Covid-19. His request was denied on April 17, 2020 (Exhibit 4). He did not seek further administrative review. He filed his motion with this court on May 15, 2020 (R. 47: Motion).

### A.  There are no extraordinary and compelling reasons to grant Lewis' compassionate release.

Compassionate release for Lewis would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing

Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

14

Section 1B1.13 limits compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Lewis and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

Lewis' age and medical condition likewise do not currently satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Lewis is 38 years old. He is being treated

15

with prescribed medications for hyperthyroidism (Grave's disease), schizophrenia and depression.  Graves' disease is the most common cause of hyperthyroidism in the United States. It is an autoimmune disorder. It affects about 1 in 200 people (*See* https://www.medicinenet.com/graves_disease/article.htm).  Because of his impending surgery, Lewis' health has been closely monitored by BOP medical staff.

BOP medical records reflect that Lewis had a medical visit on May 27, 2020, for medication refills.  He appeared well, alert and oriented. He expressed symptoms of heartburn, for which he was prescribed Omeprazole.  Lewis advised medical staff that he is taking his other prescribed medications as directed and has no issues or concerns with side effects.  The records confirm that Lewis' medical conditions are being effectively managed with prescribed medications. Within the last three months he has seen several medical specialists, including doctors at Rutgers Cancer Institute of New Jersey, who are monitoring his condition regarding hyperthyroidism.  Due to his impending surgery, extra precautions with his health are being exercised. BOP medical records also indicate that Lewis visited with the doctor for a pre-surgery check on April 15, 2020.  At that time it was determined he was prepared for surgery, no symptoms of Covid-19.  Lewis has also been diagnosed with schizophrenia, for which he is being treated with an atypical antipsychotic drug. The medical records reflect that Lewis' mental health condition is also being appropriately controlled by the medications and that he is being monitored by BOP medical staff. As such, Lewis does

16

not face a heightened risk from Covid-19. So, whether considered alone or in combination with the Covid-19 pandemic, Lewis' age and medical conditions do not satisfy the initial eligibility criteria for release under USSG §1B1.13 cmt. N.1. *See United States v Murphy*, No. 15-20411, 2020 WL 2507619, at *5-*6 (E.D. Mich. May 15, 2020).

Although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, Lewis' circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.*

Lewis is presently housed at FCI Fort Dix, which houses 2,816 inmates. There have been no deaths reported at the facility. Nineteen inmates have tested positive for Covid-19. There have been 24 inmates recovered and 5 staff recovered.

17

https://www.bop.gov/coronavirus/. All visits to the facility have been suspended until further notice. Lewis' health is being closely monitored by BOP medical staff. He has been referred to doctors outside the BOP to assess his medical issues. He is receiving regular blood tests to check his medication levels and the progression of his condition. Due to his circumstances, it is unlikely that he would receive such careful follow up and medical treatment if he were to be released. Further, even while in BOP custody he has failed to consistently take his medications for his mental health issues, which resulted in a change from oral daily medication to long-lasting injections given by the BOP medical staff. Lewis' medical conditions are best monitored by medical professionals. If he were to be released there is little assurance that he would receive such attentive medical assistance, abide by release restrictions and avoid exposing himself and innocent people to Covid-19.

Finally, even if the combination of Lewis' medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Lewis would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness

18

under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Lewis' release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under §3582(c)(1)(A). Lewis was sentenced as an armed drug trafficker to 60 months' imprisonment. Lewis was in possession of numerous firearms, ammunition and quantities of illegal drugs when he was arrested. Lewis was on pre-trial release for another federal drug trafficking case and was subject to restrictive conditions at the time of his arrest in this case. Yet, Lewis

19

continued to sell drugs, while armed with dangerous weapons. His prior criminal history includes multiple convictions involving the possession and sale of drugs. His continued willingness to engage in criminal conduct, combined with his current mental health issues, indicate that his release presents a danger to the public. Lewis is not eligible for compassionate release.

### B.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Lewis eligible for compassionate release, the § 3553(a) factors should still disqualify him.

20

Lewis' drug trafficking began in 2001, when he was just 19 years old. His criminal conduct continued, with probation violations and additional felony convictions for drug and gun offenses (PSR, ¶¶ 20-30). At the time of his arrest, he was on pre-trial release for another federal drug trafficking case. Lewis is 38 years of age. He must consistently take prescribed medication to control his schizophrenia. Even while in prison, he has been unable to consistently remember to do so, requiring the BOP to mandate monthly long-lasting injections of his medication. He has stated in his motion his intent to reside with his mother if released, however, it was at his mother's house that he was arrested and found to be in possession of the firearms and drugs. According to the PSR, Lewis' mother is a former drug user, who had been clean for 10 years at the time of his arrest (PSR, ¶ 52). She is not employed and collects social security benefits (PSR, ¶ 48). He has no assets and no means of financial support if he were to be released.

Lewis' lack of vocational skills and his lack of financial resources, combined with his substance abuse history and current mental health issues, signify that he is not prepared for release.

## III. If the Court were to grant Lewis' motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Lewis' motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

**Conclusion**

Lewis' motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney


 s/Susan E. Fairchild (P41908)
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, Michigan  48226
(313) 226-9577
E-mail: susan.fairchild@usdoj.gov

Dated: June 12, 2020


**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, and mailed a copy to defendant by U.S. Mail.

Ahmad Rashid Lewis #50190039
Fort Dix Federal Correctional Institution
P.O. Box 2000
Fort Dix, NJ 08640

Daniel Dena, Attorney for Defendant Lewis

22

s/Susan E. Fairchild  P41908
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9577
E-mail: susan.fairchild@usdoj.gov